Slip Op. 14-21

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, and TATE & LYLE AMERICAS, LLC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> YIXING-UNION BIOCHEMICAL CO., LTD., <br><br> Defendant-Intervenor. | Before: Judith M. Barzilay, Senior Judge <br><br> Consol. Court No. 11-00537 <br> **Public Version** |

**OPINION**

[Commerce's Remand Results are sustained.]

Dated:  February 24, 2014

*Joseph W. Dorn and Patrick J. Togni*, *King & Spalding LLP*, for Plaintiffs Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas LLC.

*Michael S. Holton, Jeffrey S. Neeley, and Stephen W. Brophy*, *Barnes, Richardson & Colburn, LLP*, for Consolidated Plaintiffs RZBC (Juxian) Co., Ltd., RZBC Co., Ltd., and RZBC Imp. & Exp. Co., Ltd.

*Stuart F. Delery*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director; (*Carrie A. Dunsmore*), Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for Defendant United States; *Whitney Rolig*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Counsel.

*Richard P. Ferrin and Douglas J. Heffner, Drinker Biddle & Reath LLP*, for Defendant-Intervenor Yixing-Union Biochemical Co., Ltd.

      BARZILAY, Senior Judge:  This case returns to the court following a partial remand of the final results of U.S. Department of Commerce's ("Commerce") first administrative review of the countervailing duty ("CVD") order on citric acid and certain citrate salts from the People's Republic of China ("PRC"). *See Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 77,206 (Dep't Commerce Dec. 12, 2011) ("*Final Results*"); *see also Issues and Decision Memorandum*, C-570-938 (Dec. 5, 2011), *available at* http://enforcement.trade.gov/frn/summary/PRC/2011-31838-1.pdf; *Corrected Issues and Decision Memorandum*, C-570-938 (Feb. 10, 2012) (C.R. Doc. No. INT_055151).[1]  The court instructed Commerce to provide further explanation on two issues: (1) the countervailability of the alleged subsidy of steam coal for less than adequate remuneration ("LTAR") and (2) the comparability of benchmark prices to value the benefit from sulfuric acid for LTAR. *See Archer Daniels Midland Co. v. United States*, 37 CIT __, 917 F. Supp. 2d 1331 (2013) ("*Archer Daniels I*").

      On remand, Commerce maintains that the alleged subsidy involving steam coal lacks specificity and that it properly selected benchmark prices for the subsidy involving sulfuric acid. *See Final Results of Redetermination Pursuant to Remand*, Docket Entry No. 78 (Aug. 26, 2013) (Public) ("*Remand Results*").  Plaintiffs Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas LLC (petitioners) ("ADM") filed comments challenging Commerce's determination on the specificity requirement.  Alternatively, Consolidated Plaintiffs RZBC Co., LTd., RZBC Import & Export Co., Ltd., and RZBC (Juxian)

---

[1] Familiarity with the facts and circumstances of the underlying administrative review are presumed.

Co., Ltd. (respondents) ("RZBC") filed comments challenging Commerce's determination on sulfuric acid for LTAR.[2] The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons set forth below, Commerce's *Remand Results* are sustained.

## I. STANDARD OF REVIEW

When reviewing Commerce's countervailing duty determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotations and citation omitted). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. BACKGROUND

In the underlying administrative review, Commerce investigated whether respondent companies received steam coal and sulfuric acid for LTAR. *See Citric Acid and Certain Citrate*

---

[2] Defendant-Intervenor Yixing-Union Biochemical Co., Ltd. (another respondent) ("Yixing") filed comments but did not challenge Commerce's determination on sulfuric acid.

*Salts from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 33,219 (Dep't Commerce June 8, 2011) ("*Preliminary Results*"). In the *Final Results*, Commerce concluded that the alleged subsidy on steam coal lacked *de jure* and *de facto* specificity under the statute. *See Issues and Decision Memorandum* at 50-51. In particular, Commerce determined that there was insufficient evidence establishing "predominant" or "disproportionate" use under 19 U.S.C. § 1677(5A)(D)(iii). *See id.* Accordingly, Commerce did not calculate a subsidy rate for the provision of steam coal for LTAR.

Commerce also investigated whether respondents received sulfuric acid for LTAR. It concluded that they did. In its calculation to determine the benefit received from the subsidy, Commerce concluded that the Chinese sulfuric acid market was distorted by government involvement and therefore used "tier 2" benchmarks to establish a market price for sulfuric acid. *See Preliminary Results*, 76 Fed. Reg. at 33,231-32. It solicited information from interested parties pertaining to world market prices for sulfuric acid to serve as a potential benchmark for determining the adequacy of remuneration. *See id.* In the *Final Results*, Commerce calculated a benchmark price for sulfuric acid by averaging world market prices for sulfuric acid from Canada, European Union, India, Thailand, United States, Philippines, and Peru. *See Corrected Issues and Decision Memorandum* at 6; *see also Preliminary Results*, 76 Fed. Reg. at 33,232.

### III. DISCUSSION

*A. Steam Coal – Specificity Requirement*

In *Archer Daniels I*, the court instructed Commerce to provide a better explanation of its determination on the alleged subsidy involving steam coal. *See* 917 F. Supp. 2d at 1340. More specifically, the court could not determine whether Commerce had *deferred* making a final

determination under 19 C.F.R. § 351.311 or whether it had issued a final determination on the alleged subsidy providing steam coal for LTAR. It was unclear. The court also instructed Commerce to provide further explanation of its findings and conclusions on the specificity requirement. On remand, Commerce explained that the "evidence on this record does not support a finding that the provision of steam coal is specific within the meaning of section 771(5A) of the Act." *Remand Results* at 7. The court construes this as a final determination, not a deferral under 19 C.F.R. § 351.311. There is no dispute that alleged subsidy on steam coal lacks *de jure* specificity. Commerce, therefore, limited its discussion to *de facto* specificity:

> [W]e continue to find that the users of steam coal are not limited in number, for the same reasons described in the *Final Results*. Exhibit 6 of the GOC's March 18, 2011, NSA Questionnaire Response indicates that steam coal is, in the words of the Statement of Administrative Action (SAA), "widely used throughout {the} economy.
>
> The next question in our *de facto* specificity analysis is whether an enterprise or industry (or a group of enterprises or industries) was a predominant user of the subsidy or received disproportionately large amounts of the subsidy. Normally, the Department seeks such usage information from the relevant government. Here, although the Department pursued a line of questioning with the GOC touching upon the question of predominance or disproportionality, there was not sufficient evidence, based on the record of the underlying administrative review, indicating that certain industries were the predominant users of steam coal or received disproportionately large amounts of steam coal. Accordingly, in the *Final Results*, we stated that "we do not have sufficient record evidence pointing to predominant or disproportionate use." We continue to find that the evidence on this record does not show predominant or disproportionate use.
>
> Finally, turning to section 771(5A)(iii)(IV) of the Act, we find that there is no evidence on the record that the manner in which the authority providing steam coal has exercised discretion in the decision to provide steam coal indicates that an enterprise or industry (or group thereof) is favored over others.

*Remand Results* at 6-7.

ADM (petitioners) challenges Commerce's determination on the issue of *de facto* specificity. Specifically, ADM claims that Commerce failed to request information from the

GOC about whether a certain "enterprise or industry is a predominant user of the subsidy" and whether a certain "enterprise or industry receives a disproportionately large amount of the subsidy." ADM Comments at 3. ADM argues that Commerce ignored record information indicating that "power generators" are the "predominant users" of steam coal produced in China and therefore consume a "disproportionate share" of the alleged subsidy. ADM Comments at 4-6, 8. Alternatively, ADM suggests that Commerce should reopen the record to request additional information from the GOC on the issue of "predominant use" and "disproportionate share." ADM Comments at 14.

Under 19 U.S.C. § 1677(5A)(D)(iii), a subsidy is *de facto* specific if one or more of the following factors exist: (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) the enterprise or industry is a predominant user of the subsidy; (3) the enterprise or industry receives a disproportionately large amount of the subsidy; and (4) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others. *Id.*

In the court's view, Commerce reasonably concluded that the provision of steam coal for LTAR lacked *de facto* specificity. The only question here is whether power generators[3] (like Cogeneration) are the "predominant user" or receive a "disproportionate share" of the alleged subsidy on steam coal. *See* 19 U.S.C. § 1677(5A)(D)(iii). Although Commerce attempted to obtain data on steam coal from the GOC during the course of the review, *see Remand Results* at 13, the GOC indicated that it did not collect or maintain such data in the ordinary course of

---

[3] Commerce concluded that Cogeneration (a power generator) is the parent company of Yixing (a citric acid producer) and therefore attributed potential subsidies (*i.e.*, steam coal) received by Cogeneration to Yixing. *See Issues and Decision Memorandum* at 62, 65; 19 C.F.R. § 351.525(b)(6)(vi).

business. *See id.*; GOC First Supplemental Questionnaire Response at 5 (Apr. 27, 2011) (P.D. 139). The GOC did report a list of industries in China that purchased steam coal but it did not include usage data. *See Remand Results* at 12; Government of China New Subsidy Allegation Questionnaire Response at Ex. 6 (Mar. 21, 2011) (P.D. 99). The GOC provided other data on China's coal industry generally, which included a few brief references about steam coal. *See id.* at 8-15. In this review, therefore, there was very little data on the predominant users of steam coal in China. Commerce, in turn, concluded that there was insufficient data to make a finding that power generators are the "predominant users" or receive a "disproportionate share" of steam coal. Considering that the other elements of *de facto* specificity had not been met, Commerce reasonably concluded that the alleged subsidy on steam coal lacked specificity under § 1677(5A)(D)(iii).

ADM, though, suggests that Commerce ignored record evidence demonstrating that the power generation industry is the predominant user of steam coal. The court disagrees. The record data cited by ADM covers the coal industry (in general) and is not specific to steam coal. For example, ADM cites questionnaire responses from the GOC explaining (repeatedly) that the GOC "does not disaggregate the data it collects about the coal industry by different segments of the coal industry." GOC Questionnaire Response at 8 (P.D. 99). Nevertheless, ADM quotes selected language from these questionnaire responses to advance its preferred interpretation of the information provided by the GOC. ADM Comments at 4-5. ADM also urges the court to perform calculations based on data concerning coal generally, to reach the conclusion that power generators are the predominant users of steam coal specifically. ADM Comments at 5 ("The GOC further provided data on the total volume of domestic production of 'coal,' which it asserted covered all forms of coal produced in China, including steam coal. That data showed

production volumes of 2.69 billion tons in 2007, 2.80 billion tons in 2008, and 2.97 billion tons in 2009. Thus, the record shows that over 77 percent of domestic coal production in China from 2007 to 2009 was steam coal consumed by steam coal purchasers."). ADM jumps from one data set to another in a series of undeveloped arguments about the steam coal industry in China. ADM Comments at 4-5. These arguments are not persuasive.

The GOC's few references to steam coal are also not helpful. For example, after explaining that it does not maintain data on steam coal, the GOC did reference data compiled by the Coal Transportation and Sale Association, and stated "[w]hile GOC does not maintain particular records regarding the total volume of domestic production of steam coal, this percentage can be calculated by deducting the total volume of imported steam coal, which the GOC maintains records of and provides below, from the total volume of domestic consumption." GOC Questionnaire Response at 10 (P.D. 99). In response to Commerce's follow-up question on this issue, the GOC stated that "[t]he amount of yearly coal purchases for particular industries is not information that is maintained or gathered by the Coal Transportation and Sale Association in the ordinary course of business. The GOC cannot provide the requested information." GOC First Supplemental Questionnaire Response at 5 (P.D. 139). This information is not useful because it provides no insight into the steam coal industry. The court cannot endorse ADM's suggested interpretation of the data submitted by the GOC. Commerce did not ignore this data. It reasonably concluded that it provided little information about the predominant users of steam coal in China. *See Remand Results* at 12-13.

ADM also cites (1) a 2007 speech by an official with the China National Coal Association titled "The 11th Period Five-Year Plan for China's Coal Sector" and (2) an the U.S. Geological Survey, Minerals Yearbook on China for the years 2005, 2007, and 2008. *See* U.S.

Department of the Interior, U.S. Geological Survey, Minerals Yearbook- China 2005, 2007, 2008 (P.D. 57 Ex. 19, 20, 24); Guangde Wang, Speech 4 P.R. China, The 11th Period Five-Year Plan for China's Coal Sector (Feb. 6, 2007) (P.D. 57 Ex. 21).  Commerce ordinarily seeks usage data from the relevant government authority. *See Remand Results* at 7.  These documents, which come from sources other than the GOC, discuss the coal industry in China from a macroeconomic point of view and do not provide sufficient data about the predominant users of steam coal to satisfy the specificity requirement.

But ADM again urges to court to draw specific inferences about steam coal usage from broad macro statements about the coal industry.  ADM Comments at 10 ("The USGS Minerals Yearbooks corroborate the data cited by Mr. Wang and state that coal is the key or primary source of energy in China, that approximately 50 percent of the country's total coal output is used by power plants or the country's power sector, and that this figure was growing. . . . That steam coal is used in power generation is not in dispute. Thus, the USGS Minerals Year books provide relevant evidence of steam coal usage which demonstrates that power generators are the predominant users and receive a disproportionate share of the subsidy.").  ADM relies on this type of deductive reasoning throughout its brief. ADM Comments at 5-11.

The court, though, cannot draw any meaningful inferences and conclusions about the predominant users of steam coal (during a specific period of review) from these general statements about China's coal industry.  The GOC questionnaire responses indicate that references to the coal industry can include both steam coal and coking coal. *See* GOC Questionnaire Responses at 9 (P.D. 99) ("For example, nine of the top 10 coal producers in China produce both steam coal and coking coal.").  The court would need information that actually discusses the major users of steam coal or more clearly supports drawing specific

inferences about steam coal usage from data on coal generally. Such information does not exist on this record.[4]

The court will also not order Commerce to reopen the record for another round of questions as suggested by ADM. ADM Comments at 14. This case does not present the type of facts that would justify such a remedy. *See, e.g, Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277-78 (Fed. Cir. 2012) ("*Essar*"). Though ADM makes much of Commerce's "failure" to seek usage data from the GOC, *see Issues and Decision Memorandum* at 50, Commerce did issue two rounds of questionnaires (during the review) to the GOC seeking information about steam coal. *See* GOC Questionnaire Responses (P.D. 99, 139). It received a fairly straightforward answer: the GOC does not possess the specific steam coal data necessary to make an affirmative finding on "predominant use" or "disproportionate share." There is no reason to believe that the GOC will produce new information on this issue. Commerce's determination that the alleged subsidy on steam coal lacks *de facto* specificity is reasonable and therefore supported by substantial evidence.

### B. Sulfuric Acid – Factors Affecting Comparability

In *Archer Daniels I*, the court instructed Commerce to address "factors affecting comparability" in its selection of benchmark prices for sulfuric acid. *See* 917 F. Supp. 2d at 1345. The court also instructed Commerce to consider certain record evidence that was not considered because Commerce deemed RZBC's (respondent) arguments on this issue untimely.

---

[4] ADM also cites several administrative determinations to support its position. ADM Comments at 12. These determinations actually undermine ADM's position because they have distinguishable facts. They involve determinations where Commerce made a finding of "predominant use" or "disproportionate share" based on industry or company specific usage data. Again, there is no such data on this record.

*See id.*  On remand, Commerce concluded that its benchmark for sulfuric acid was comparable to sulfuric acid available in China.  Specifically, Commerce explained that

> Contrary to RZBC's claims, the record indicates that RZBC's purchases of sulfuric acid from foreign suppliers (those purchases which RZBC asserted in its case brief should be used as tier-one benchmark prices) were comparable to the inputs related to Petitioners' benchmark prices. Specifically, we note that RZBC imported sulfuric acid under the same harmonized tariff schedule number as the products Petitioners used in their world market price benchmarks. Thus, RZBC's claims that Petitioners' benchmarks are incomparable to the sulfuric acid consumed by RZBC are without merit and, instead, the record shows Petitioners' benchmark prices are of comparable inputs to RZBC's.
>
> In addition, RZBC's claim that it uses "industrial grade" sulfuric acid . . . was not mentioned on the record previously. Based on the record at the time, the Department could not ascertain the validity of this statement or the consequential argument that Petitioners' benchmarks were not comparable to this "industrial grade." Thus, we found RZBC's argument to be untimely. On remand, we determine that this argument is simply unsupported by record evidence. RZBC did not cite to any record evidence supporting its argument that it used industrial grade sulfuric acid, and it did not cite to any evidence that the benchmarks submitted by Petitioners (and used by the Department in the *Preliminary Results*) omitted industrial grade sulfuric acid.
>
> Regarding the second point, while the supporting documentation provided by RZBC shows varying prices of non-technical grades of sulfuric acid, it does not show that Petitioners' benchmarks are distorted or incomparable. First, the price information RZBC submitted consists of U.S. price quotes for small quantities of sulfuric acid that, according to RZBC, are used for laboratory purposes. RZBC did not state whether, or provide evidence that, these grades of sulfuric acid are traded internationally. Further, RZBC did not provide any evidence demonstrating that non-technical grades of sulfuric acid were included in Petitioners' benchmarks, nor did it provide evidence demonstrating that those non-technical grades of sulfuric acid comprise a significant percentage of the world benchmark prices presented by Petitioners. Thus, despite RZBC's accusation, the Department could not reasonably conclude that non-technical grades of sulfuric acid were included in Petitioners' benchmarks, or that they distort the benchmarks to a degree that would render them unusable.
>
> On the third point that Petitioners "cherry picked" the benchmark countries, we find that apart from this brief claim, RZBC did not provide any evidence or explanation demonstrating how or why the benchmark countries put forth by Petitioners were poor or distortive selections for tier-two benchmarks. Therefore, RZBC's arguments are unsupported and do not undermine the

> reasonableness of the countries used for the sulfuric acid benchmark in the *Final Results*.
>
> Finally, we note that RZBC's benchmark comments in the RZBC Rebuttal Comments were filed prior to the Department's initiation of an investigation of the alleged subsidy program and were presented in the context of whether the information put forth in Petitioners' allegation supported a finding of financial contribution or benefit for initiation purposes. These comments were not submitted in response to our Solicitation of Factual Information, and they were not submitted in response to Petitioners' benchmark information in Petitioners' Submission of Factual Information. Apart from its RZBC Case Brief, RZBC did not comment on the benchmark selection for this subsidy program subsequent to the Department's initiation of the subsidy program, nor did it take advantage of the opportunity to submit its own benchmark information in response to our explicit invitation for parties to do so. . . . Petitioners' submission of benchmark information in Petitioners' Submission of Factual Information, which the Department ultimately used in the *Preliminary Results* and the *Final Results*, constituted the only benchmark information on the record. Even if RZBC's ultimate view was that the Department should use tier-one benchmarks, if RZBC took issue with the only tier-two benchmarks on the record, it could have submitted its own tier-two benchmark information and still argued for the use of tier-one benchmarks for the *Final Results*. Because it did not do so, however, once we determined that tier-two benchmarks were appropriate in this case (a determination upheld by the Court), we only had Petitioners' benchmarks to select from. Moreover, as explained above, the Department did not find record evidence showing that Petitioners' benchmarks were not suitable. Thus, the use of these benchmarks was and is appropriate in this case.

*Remand Results* at 9-11.

RZBC challenges Commerce's selection of benchmark prices. RZBC argues that "there is record evidence that shows the Canadian, EU, Thai, Indian, Peruvian and Philippine benchmarks obtained from the 4, 6, and 8 level harmonized system (HS) code subheadings were not obtained at a comparable HS subheading as RZBC's purchases. Other than merely asserting the conclusion that the benchmarks are comparable, neither Commerce, nor Petitioners or any other party, in any submission, cite to record evidence or provide a coherent or reasoned explanation on how the various 4, 6, and 8 level HS code subheadings are comparable with one another, let alone with the 10-digit harmonized tariff system (HTS) number and HS code

reported by RZBC." RZBC Comments at 3-4.  RZBC claims that "[t]he problem with Commerce's argument (except for possibly the U.S. benchmark price) is that the benchmark prices used in the *Final Results* do not use the <u>same</u> HTS number or HS code as reported by RZBC, nor is there any explanation how the HS codes might be comparable." RZBC Comments at 4.

Under the CVD statute, a benefit is conferred where "goods . . . are provided . . . for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv).  In determining whether goods have been provided for LTAR, Commerce must identify a benchmark price (market based price) to compare with the price of goods receiving a government subsidy. *See Essar*, 678 F.3d at 1273. Commerce, in turn, "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good . . . resulting from actual transactions." 19 C.F.R. § 351.511(a)(2)(i).  This is known as a "tier 1" benchmark. *See Essar*, 678 F.3d at 1273.  Where, as here, there is no market-determined price available to make a comparison, Commerce "will seek to measure the adequacy of remuneration by comparing the government price to a world market price," 19 C.F.R. § 351.511(a)(2)(ii), or, alternatively, Commerce will average such prices to the extent practicable where there is more than one commercially available world market price, with due allowance for factors affecting comparability. *Id.*  This is known as a "tier 2" benchmark. *See Essar*, 678 F.3d at 1273.

Here, Commerce's selection of "tier 2" benchmarks is not in dispute.  The only issue is whether Commerce properly considered factors affecting comparability in its selection of world market prices.  More specifically, the court requested that Commerce consider the different grades of sulfuric acid referenced by RZBC.  Commerce considered this information and concluded that there was no need to adjust its benchmark price calculation. *See Remand Results*

at 9-11.  RZBC, though, maintains that Commerce selected overly broad benchmarks to calculate a value for the sulfuric acid used by RZBC.  RZBC argues that Commerce should use benchmarks that are more specific to the grade of sulfuric acid used by RZBC.  The court is not persuaded.

In the underlying review, Commerce solicited information from the interested parties on world prices of sulfuric acid for the specific purpose of establishing a benchmark price for sulfuric acid.  Though RZBC filed comments challenging the subsidy allegation on sulfuric acid, it did not submit its own proposed world market prices for sulfuric acid as requested by Commerce.  *See Remand Results* at 20.  Only petitioners submitted world market prices (from Canada, EU, Thailand, India, and United States) for 2009, which Commerce used to calculate a benchmark price for sulfuric acid in the *Preliminary Results*. *See id.* at 33,232.

Subsequently, Commerce requested additional world pricing data for 2008.  One of the mandatory respondents, Yixing, submitted world market prices from India, Peru, and Philippines for 2008, which, together with benchmark prices submitted by petitioners for 2009, established the world market price for sulfuric acid.[5]  In the *Final Results*, Commerce adjusted its calculation to evaluate the adequacy of remuneration for RZBC covering the 2008-09 period of review. *See Corrected Issues and Decision Memorandum* at 6.  Commerce's selection of world market prices

---

[5]  Although it has no bearing on the outcome of this case, there appears to be some confusion about this fact. In the *Remand Results*, Commerce states that the benchmark prices for India, Peru, and the Philippines "were submitted by another mandatory respondent in the underlying review, Yixing Union." *Id.* at 18.  This, though, is inconsistent with Commerce's *Corrected Issues and Decision Memorandum*, which states "[w]e received full-year 2008 sulfuric acid world price benchmarks from RZBC, which were based on World Trade Atlas export data for India, Peru and the Philippines. . . . Other than the above-mentioned changes, (using the whole year 2008 sales data, using the 2008 sulfuric acid world price benchmarks RZBC provided . . . ), we used the same calculation methodology to calculate RZBC's sulfuric acid benefit as described in the *Preliminary Results*. *See Corrected Issues and Decision Memorandum* at 5-6.

for sulfuric acid is consistent with the regulation, provided that it considered factors affecting comparability.

On remand, Commerce properly considered factors affecting comparability. Commerce measured comparability by the Harmonized Tariff Schedule Heading for sulfuric acid. It accepted, as comparable, world market prices (export data) for sulfuric acid under HTS Heading 2807. There is no dispute that RZBC purchases sulfuric acid under HTS Heading 2807 (Sulfuric Acid; Oleum). Some of the world market prices used by Commerce reflect sulfuric acid exports of different varieties under the HTS. For example, Commerce accepted Canadian benchmark prices derived from the 6-digit HTS subheading (2807.00), EU and Indian benchmarks derived from the 4-digit HTS heading (2807), and Thai[6] benchmarks derived from the 8-digit HTS subheading (2807.0000). *See Remand Results* at 17-19. RZBC claims that it purchases sulfuric acid under a 10-digit Chinese HTS subheading (2807.0000.00), which it describes as "industrial grade [[   ]] sulfuric acid purchased in significant quantities with various minimum solutions above [[    ]]." RZBC Comments at 4-5. It contends that Commerce erred by selecting benchmarks prices from the more general HTS provisions that have concentration levels less than 50% and small export quantities. RZBC Comments at 7. Commerce, though, is required only to select benchmarks that are comparable, not identical. *See* 19 C.F.R. § 351.511(a)(2)(ii).

The selected benchmarks are comparable in the sense that they all reflect world market prices for sulfuric acid (a commodity product) under HTS Heading 2807. RZBC has not demonstrated that Commerce's selection of benchmarks at the 4, 6, and 8-digit levels is so

---

[6] The Thai benchmark information was derived from searches at the 8-digit level under the HTS, which included information about sulfuric acid at the 11-digit level. For example, pricing data on HTS 2807.0000 included pricing data on HTS 2807.0000.202. Commerce did not select the 11-digit data as a benchmark and instead summed the monthly quantities and values for these more detailed subheadings to arrive at a benchmark at the 8-digit level of detail. *See Remand Results* at 15 n.56, 17.

distortive as to render Commerce's benchmark calculation unreasonable. Although there may be variations in pricing among different grades and concentration levels of sulfuric acid, RZBC has not provided sufficient evidence of such divisions within the sulfuric acid market. RZBC would need to demonstrate more clearly that including lower grades (and perhaps quantities) of sulfuric acid is inappropriate under the regulation. RZBC's reference to U.S. price quotes for non-technical grades of sulfuric acid and selected purchase documents are not sufficient. RZBC fails to establish that Commerce's benchmarks unreasonably distort the price of sulfuric acid.

Moreover, the court is unable to identify any authority indicating that Commerce's benchmark selection was improper. It appears to be consistent with past CVD determinations involving the PRC. *See Issue and Decision Memorandum* at 17 n.12; *Preliminary Results*, 76 Fed. Reg. at 33,232 n.10. RZBC takes the stance that Commerce must use benchmark prices at the ten and eleven-digit level of specificity, which implies that Commerce must use benchmark prices that are nearly identical to RZBC's reported purchases to satisfy the regulation. RZBC Comments at 13. The regulation, however, does not manifest such a stringent standard. It requires only that the selected benchmarks be comparable. Considering that sulfuric acid is a commodity product, and that RZBC did not establish clear divisions within the sulfuric acid market, Commerce's selection of benchmark prices for sulfuric acid at the 4, 6, and 8 digit level is consistent with the regulation.

Commerce, for its part, did solicit benchmark information on two separate occasions and accepted world market prices from both petitioners and respondents. Although RZBC disputed Commerce's selection of benchmark prices, and cited some data to support its position, it did not establish evidence sufficient to overcome the deferential standard of review that applies to Commerce's factual determinations. Ultimately, RZBC has not demonstrated that its proposed

benchmark calculation is the only reasonable outcome on this administrative record.  *See,e.g.*, *Allied Tube and Conduit Corp. v. United States*, 24 CIT 1357, 1371, 127 F. Supp. 2d 207, 220 (2000) ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its factual conclusions as the only reasonable outcome.").  Therefore, Commerce's determination on this issue is supported by substantial evidence.

## IV.  CONCLUSION

For the foregoing reasons, Commerce's *Remand Results* are sustained.  Judgment will be entered accordingly.


Dated:  February 24, 2014                                        /s/ Judith M. Barzilay
       New York, NY                                             Judith M. Barzilay, Senior Judge